## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STATE OF NEW YORK, *et al.*,

    *Plaintiffs*,

v.

DOUGLAS J. BURGUM, in his official capacity as
Secretary of the United States Department of the
Interior, *et al.*

    *Defendants*.

C.A. No. 1:26-cv-00072-RCL

## PLAINTIFFS' MOTION FOR
## PRELIMINARY INJUNCTION AND STAY PENDING REVIEW

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1, and
the Administrative Procedure Act, 5 U.S.C. § 705, plaintiffs State of New York and
New York State Energy Research and Development Authority (together, the State)
hereby move for this Court to issue a preliminary injunction enjoining and a stay
pending review of the December 22, 2025 order issued by the Bureau of Ocean Energy
Management's (BOEM) Acting Director Matthew Giacona "suspend[ing] all ongoing
activities related to the Sunrise Wind Project on the Outer Continental Shelf for the
next 90 days for reasons of national security" (the Suspension Order).

The Sunrise Wind Project is a commercial-scale offshore wind project that will
bring approximately 924 megawatts of energy to New York pursuant to an agreement
with New York State Energy Research and Development Authority. The Project has
received approvals from all relevant federal, state, and local agencies and began
construction in July 2024. At the time Sunrise Wind received the Suspension Order,

the Project was 45% complete. As set forth by Sunrise Wind in its related challenge pending before this Court, captioned *Sunrise Wind LLC v. Burgum et al.*, 1:26-cv-00028-RCL (D.D.C.) (*Sunrise*) and to which the instant case is related, the Suspension Order poses an existential threat to the Project.

The Suspension Order is unlawful because it is arbitrary and capricious and violates the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). The State therefore seeks a preliminary injunction enjoining the Suspension Order. As set forth by Sunrise Wind, defendants' unlawful action is already irreparably harming Sunrise Wind. The State is additionally and distinctly irreparably harmed by the Suspension Order because it and the potential cancellation of the Sunrise Wind Project will undermine New York's efforts to ensure a reliable supply of electricity, interfere with New York's climate objectives, deprive New York of tax revenue and other economic benefits, and threaten public health by delaying New York's transition to energy sources that cause less air pollution. The balance of the equities and the public interest strongly favor an injunction so that the myriad benefits of the Project can flow to the public.

On January 13, 2026, pursuant to Local Civil Rule 7(m), counsel for the State contacted counsel for defendants to meet and confer regarding this motion and to request that defendants provide the classified information on which the Suspension Order is purportedly based to an attorney for the State with an appropriate security clearance. Counsel met on January 15 and were unable to resolve those matters and agreed that they would submit a proposed briefing schedule for this motion to the

Court after the State submits its motion. The State also requests that it be heard on its motion during the hearing scheduled in the *Sunrise Wind LLC v. Burgum* case set for February 2, 2026, at 11:00 am.

The grounds for this motion are fully set forth in the State's accompanying Statement of Points and Authorities, and Declarations of Gregory Lampman and Sanjay Seth. The State also relies on and incorporates by reference the Statement of Points and Authorities submitted by Sunrise Wind, *Sunrise*, ECF No. 11, and its accompanying declarations. A proposed order is also attached. For the reasons set forth in the State's supporting documents, the Court should enter an Order granting the preliminary injunction and stay of the Suspension Order. Additionally, the State respectfully requests a hearing pursuant to Local Civil Rule 65.1(d), and specifically to participate in the hearing scheduled for February 2, 2026, at 11:00 am in the *Sunrise Wind LLC v. Burgum* case, given the irreparable harm that the State will experience in the absence of immediate relief.

Date: January 16, 2026
          New York, New York

Respectfully submitted,

LETITIA JAMES
Attorney General of New York

By:      /s/ *Joya Sonnenfeldt*
Monica Wagner
    *Deputy Bureau Chief*
Rene F. Hertzog
Laura Mirman-Heslin
Joya Sonnenfeldt
    *Assistant Attorneys General*
Libby Dimenstein
    *Special Assistant Attorney General*

Environmental Protection Bureau
28 Liberty Street
New York, New York 10005
(212) 416-8184
Joya.Sonnenfeldt@ag.ny.gov

Morgan Costello
   *Deputy Bureau Chief*
Environmental Protection Bureau
The Capitol
Albany, New York 12224

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2026, I caused the foregoing Motion for Stay and Preliminary Injunction, including all documents associated therewith, to be filed electronically through the Court's CM/ECF system, which will serve a Notice of Electronic Filing upon all counsel of record. Additionally, with prior consent, I provided an electronic copy of these documents to Kristofor R. Swanson, counsel for Defendants, via email. Plaintiffs are preparing paper service of these documents on Defendants and will file an additional certificate of service once mailing is complete.

*/s/ Joya Sonnenfeldt*
Joya Sonnenfeldt

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STATE OF NEW YORK, *et al.*,

    *Plaintiffs*,

v.

DOUGLAS J. BURGUM, in his official capacity as
Secretary of the United States Department of the
Interior, *et al.*

    *Defendants*.

C.A. No. 1:26-cv-00072-RCL

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND STAY
## PENDING REVIEW

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii

INTRODUCTION .............................................................................................. 1

BACKGROUND................................................................................................. 2

    A.   Legal Background ............................................................................... 2

        1.   The Outer Continental Shelf Lands Act...................................... 2

        2.   New York's Offshore Wind Standard and Climate Act................... 4

    B.   Factual Background............................................................................. 6

        1.   The Sunrise Wind Project ........................................................ 6

        2.   The Wind Memo and Offshore Wind Suspension Orders ............... 8

        3.   New York's Injuries ............................................................... 12

    C.   Challenges to the Suspension Orders Regarding the Other Offshore
        Wind Projects ................................................................................. 19

ARGUMENT ................................................................................................... 20

    I.   THE STATE HAS STANDING TO CHALLENGE THE SUSPENSION
        ORDER. ........................................................................................ 20

    II.   THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION
        AND A STAY PENDING REVIEW................................................... 23

        A.   The State Is Likely to Succeed on the Merits................................ 24

        B.   The State Will Suffer Irreparable Harm Absent Preliminary Relief.......... 25

        C.   The Balance of the Equities and Public Interest Favor Preliminary
        Relief. ........................................................................................ 30

CONCLUSION................................................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
   585 U.S. 579 (2018) ........................................................................... 27

*Akiachak Native Cmty. v. Jewell,*
   995 F. Supp. 2d 7 (D.D.C. 2014) ...................................................... 28

*Alaska v. U.S. Dep't of Transp.,*
   868 F.2d 441 (D.C. Cir. 1989) .......................................................... 21

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
   458 U.S. 592 (1982) ........................................................................... 22

*Amoco Prod. Co. v. Vill. of Gambell,*
   480 U.S. 531 (1987) ........................................................................... 29

*Animal Welfare Inst. v. Martin,*
   588 F. Supp. 2d 70 (D. Me. 2008) .................................................... 24

*Belmont Mun. Light Dep't v. FERC,*
   38 F.4th 173 (D.C. Cir. 2022) .......................................................... 21

*Brady Campaign to Prevent Gun Violence v. Salazar,*
   612 F. Supp. 2d 1 (D.D.C. 2009) ...................................................... 30

*California v. EPA,*
   72 F.4th 308 (D.C. Cir 2023) ............................................................ 22

*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.,*
   513 F. Supp. 3d 154 (D.D.C. 2021) .................................................. 29

*Cent. United Life, Inc. v. Burwell,*
   128 F. Supp. 3d 321 (D.D.C. 2015) .................................................. 31

*Colorado v. EPA,*
   989 F.3d 874 (10th Cir. 2021) .......................................................... 23

*Czyzewski v. Jevic Holding Corp.,*
   580 U.S. 451 (2017) ........................................................................... 22

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ............................................................................ 24

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ........................................................................ 25

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ........................................................................ 24

*Franchise Tax B. of Cal. v. Alcan Aluminum Ltd.*,
   493 U.S. 331 (1990) ........................................................................ 22

*Gutierrez v. Saenz*,
   606 U.S. 305 (2025) ........................................................................ 23

*Illinois v. Fed. Emergency Mgmt. Agency*,
   801 F. Supp. 3d 75 (D.R.I. 2025) .................................................... 25

*Kansas v. United States*,
   249 F.3d 1213 (10th Cir. 2001) ...................................................... 27

*League of Women Voters of the U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ...................................................... 29, 31

*Louisiana v. Biden*,
   622 F. Supp. 3d 267 (W.D. La. 2022) .............................................. 28

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .................................................................. 20, 23

*Maine v. Norton*,
   257 F. Supp. 2d 357 (D. Me. 2003)................................................. 22

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ........................................................................ 22

*Massachusetts v. NIH*,
   770 F. Supp. 3d 277 (D. Mass. 2025) .............................................. 31

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .......................................................................... 24

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
   783 F. Supp.3d 290 (D.D.C. 2025) .................................................. 23

*Nat. Res. Def. Council v. Kempthorne,*
  525 F. Supp. 2d 115 (D.D.C. 2007) ...................................................... 31

*Nat. Res. Def. Council v. Wheeler,*
  955 F.3d 68 (D.C. Cir. 2020) ................................................................ 22

*New Jersey v. EPA,*
  989 F.3d 1038 (D.C. Cir. 2021) ........................................................... 22

*New York v. Trump,*
  No. 25-cv-11221, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) ................... 9, 23, 28

*Nken v. Holder,*
  556 U.S. 418 (2009) ....................................................................... 24, 30

*Open Cmtys. All. v. Carson,*
  286 F. Supp. 3d 148 (D.D.C. 2017) ....................................................... 29

*Pennsylvania v. DeVos,*
  480 F. Supp. 3d 47 (D.D.C. 2020) ........................................................ 23

*Thakur v. Trump,*
  787 F. Supp. 3d 955 (N.D. Cal. 2025) ................................................... 25

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ............................................................................ 21

*Wagner v. Taylor,*
  836 F.2d 566 (D.C. Cir. 1987) .............................................................. 26

*Winter v. Nat. Res. Def. Council,*
  555 U.S. 7 (2008) .................................................................... 23-25, 30

*Wis. Gas Co. v. FERC,*
  758 F.2d 669 (D.C. Cir. 1985) (per curiam) ........................................... 26

*Woonasquatucket River Watershed Council v. USDA,*
  778 F. Supp. 3d 440 (D.R.I. 2025) ....................................................... 28

*Wyoming v. Oklahoma,*
  502 U.S. 437 (1992) ............................................................................ 22

## Federal Statutes

5 U.S.C. § 705 ............................................................................... 1, 23, 32

5 U.S.C. § 706 (2) (A) ............................................................................ 24

43 U.S.C. § 1332 (3) ............................................................................ 2, 11

43 U.S.C. § 1337 (p) (4) ............................................................................ 3

43 U.S.C. § 1341 ............................................................................ 8

43 U.S.C. § 1341 (c) ............................................................................ 4

Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356c ............................ 2, 4, 7

## State Statutes

Climate Leadership and Community Protection Act, 2019 N.Y. Laws
    ch. 106 ............................................................................ 5, 17-18, 27

N.Y. Env't Conserv. Law § 75-0103 (13) (e) ............................................ 6

N.Y. Env't Conservation Law § 75-0107 ............................................ 17

N.Y. Pub. Serv. Law § 66-p (2) ............................................................ 17

N.Y. Pub. Serv. Law § 66-p (5) ............................................................ 18

## Federal Regulations

30 C.F.R. § 585.102 (a) ............................................................................ 4

30 C.F.R. § 585.417 (a) ............................................................................ 4

30 C.F.R. § 585.417 (b) ............................................................................ 4

30 C.F.R. § 585.418 (c) ............................................................................ 4

30 C.F.R. § 585.600 ............................................................................ 3

30 C.F.R. § 585.620 ............................................................................ 3

30 C.F.R. § 585.621 ................................................................................. 3

30 C.F.R. § 585.622 ................................................................................. 3

30 C.F.R. § 585.623 ................................................................................. 3

30 C.F.R. § 585.624 ................................................................................. 3

30 C.F.R. § 585.625 ................................................................................. 3

30 C.F.R. § 585.626 ................................................................................. 3

30 C.F.R. § 585.627 ................................................................................. 3

30 C.F.R. § 585.628 ................................................................................. 3

30 C.F.R.
    Part 585 ........................................................................................ 3, 7

43 C.F.R.
    Part 46 ............................................................................................. 3

**Rules**

D.D.C. R. 65.1 ................................................................................... 1, 32

Fed. R. Civ. P. 65 .............................................................................. 1, 32

**Miscellaneous Authorities**

BOEM, Director's Order to Revolution Wind, LLC (Aug. 22, 2025),
    https://perma.cc/DY5P-AYJT ........................................................ 9

Compl., Ex. A, BOEM, Director's Order to Sunrise Wind LLC, Sunrise Wind
    LLC v. Burgum, C.A. No. 1:26-cv-00028 (D.D.C. Jan. 6, 2026), ECF No. 1-
    1 ..................................................................................................... 10

Minute Order Granting Mot. Prelim. Inj., Empire Leaseholder LLC v.
    Burgum, No. 1:26-cv-00004 (D.D.C. Jan. 15, 2026) ............................ 19

NYSERDA, NYSERDA Report No. 17-25, New York State Offshore Wind
    Master Plan (2018) ......................................................................... 4

Order Granting Mot. for Prelim. Inj., Revolution Wind, LLC v. Burgum, No.
    1:25-cv-02999 (D.D.C. Sept. 22, 2025), ECF No. 36 ................................................. 9

Order Granting Mot. Prelim. Inj. & Order Granting State Pls.' Mot. Prelim
    Inj., Revolution Wind, No. 1:25-cv-02999 (Jan. 12, 2026) ECF Nos. 63-64 ......... 19

Restoring the United States Department of War, Exec. Order No. 14,347 of
    Sept. 5, 2025, Fed. Reg. 43,893 (Sept. 10, 2025) .................................................... 3

Temporary Suspension of Delegated Authority, Sec'y of the Interior Order
    No. 3415 (Jan. 20, 2025), https://www.doi.gov/document-library/secretary-
    order/3415-temporary-suspension-delegated-authority ......................................... 9

Temporary Withdrawal of All Areas on the Outer Continental Shelf from
    Offshore Wind Leasing and Review of the Federal Government's Leasing
    and Permitting Practices for Wind Projects, Presidential Mem. of Jan. 20,
    2025, 90 Fed. Reg. 8,363 (Jan. 29, 2025) ................................................................ 9

# INTRODUCTION

On December 22, 2025, defendant Bureau of Ocean Energy Management (BOEM) Acting Director Giacona (together with the other defendants, "Agency Defendants") directed Sunrise Wind to "suspend all ongoing activities related to [the Sunrise Wind Project] on the Outer Continental Shelf for the next 90 days for reasons of national security" (Suspension Order). That order will cause irreparable and substantial harm to New York by halting a vital offshore wind energy project that has been a key part of New York's long-term energy planning and should be enjoined.

Offshore wind has been a major part of New York's long-term energy planning for many years, both to ensure a reliable source of electricity and to meet New York's climate objectives by increasing the production of electricity by sources that do not generate greenhouse gas emissions in accordance with state law. After several years of review and approvals by relevant federal, state, and local agencies, plaintiff New York State Energy Research and Development Authority (NYSERDA) (together with the plaintiff State of New York, the State) entered into a long-term contract with Sunrise Wind LLC (Sunrise Wind) to operate an offshore wind project (Sunrise Wind Project) that will provide new energy to Long Island, which has limited transmission infrastructure. Sunrise Wind began construction of the Project in July 2023 and it is nearly 45% complete.

The State has challenged the Suspension Order as arbitrary and capricious and seeks a preliminary injunction under Federal Rule of Civil Procedure 65 and Local Rule 65.1 enjoining the Order and a stay of the Order pending review under 5 U.S.C. § 705. The State is likely to succeed on the merits of its claim that the

Suspension Order is arbitrary and capricious for the reasons stated by Sunrise Wind in its related challenge to the Order and for the additional reason that the Order did not consider New York's reliance interests, as required when an agency changes its position. A preliminary injunction will prevent irreparable harm to New York and is in the public interest because the suspension and potential cancellation of the Sunrise Wind Project will undermine New York's efforts to ensure a reliable supply of electricity, interfere with New York's statutory objectives and resilience strategy, deprive New York of tax revenue and other economic benefits, and threaten public health by delaying New York's transition to energy sources that cause less air pollution.

## BACKGROUND

### A.    Legal Background

#### 1.    The Outer Continental Shelf Lands Act

Offshore wind energy on the Outer Continental Shelf is a highly regulated industry governed at the federal level by the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331–1356c, which is designed to ensure responsible siting, planning, construction, operation, and decommissioning of offshore wind projects. OCSLA states that the Outer Continental Shelf is "a vital national resource reserve held by the Federal Government for the public," and directs the Interior Secretary to facilitate its "expeditious and orderly development" while maintaining competition and environmental safeguards. 43 U.S.C. § 1332(3). The Interior Secretary "shall ensure that any activity" authorized "is carried out in a manner that provides for"

twelve factors, including safety, protection of the environment, and protection of national security interests of the United States. *Id.* § 1337(p)(4).

BOEM administers the Outer Continental Shelf leasing program pursuant to its renewable energy regulations in 30 C.F.R. Part 585. BOEM identifies leasing areas, conducts environmental assessments prior to leasing, and then leases the areas out to wind developers, usually through a competitive bidding process. Lessees must prepare a proposal for the development of a wind energy facility and submit a Construction and Operations Plan. *Id.* §§ 585.600, 585.620–585.628. The Construction and Operations Plan must demonstrate, among other things, that the project will be conducted in a manner that does not unreasonably interfere with other uses of the Outer Continental Shelf, including those relating to national security or defense. *Id.* § 585.621(d).

BOEM conducts a thorough review of a project's Construction and Operations Plan, including developing an environmental impact statement, coordinating with other agencies (including the Department of War (DOW)[1] and interested stakeholders, as well as complying with numerous other federal laws. *Id.* § 585.628; 43 C.F.R. Part 46. BOEM must ensure the application complies with OCSLA and that

---

[1] On September 5, 2025, President Trump issued an executive order seeking to change the name of this federal agency from the Department of Defense to the Department of War. Restoring the United States Department of War, Exec. Order No. 14,347 of Sept. 5, 2025, Fed. Reg. 43,893 (Sept. 10, 2025). This complaint uses "Department of War" or "DOW," except where a quoted document or other material refers to the "Department of Defense" or "DOD."

activities are carried out "in a manner that provides for and reaches a rational balance among" the twelve factors enumerated by OCSLA. 30 C.F.R. § 585.102(a).

OCSLA provides very narrow authority for suspending operations due to national security concerns. It directs the Interior Secretary to include in all leases "a provision whereby authority is vested in the Secretary, upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, after August 7, 1953, to suspend operations under any lease." 43 U.S.C. § 1341(c). BOEM's regulations provide that BOEM may order a "suspension" of a lease in only two circumstances: (1) "[w]hen necessary to comply with judicial decrees prohibiting some or all activities under [the] lease[,]" or (2) "[w]hen the suspension is necessary for reasons of national security or defense." 30 C.F.R. §§ 585.417(a), (b). Under OCSLA's regulations, if BOEM orders a lease suspension, BOEM's "written order [must] explain the reasons for its issuance and describe the effect of the suspension order on [the] lease . . . and any associated activities." *Id.* § 585.418(c).

### 2.    New York's Offshore Wind Standard and Climate Act

In 2018, NYSERDA released a comprehensive plan to encourage the development of offshore wind. The plan states that "[t]he development of offshore wind energy . . . will stimulate the State's economy, support revitalization of maritime communities, spur infrastructure investment, and help create a new American industry centered in New York State that will create thousands of new jobs for skilled workers." NYSERDA, NYSERDA Report No. 17-25, New York State Offshore Wind Master Plan at 5 (2018).

That same year, New York's Public Service Commission (the PSC) adopted an "Offshore Wind Standard" calling for the procurement of offshore wind energy generation to serve New York's electricity needs. The PSC found that due to "its proximity and direct access to load centers, offshore wind would provide substantial reliability and diversity benefits to the electric system."[2] It also noted that offshore wind energy would reduce greenhouse gas emissions and "produce significant public health benefits by displacing fossil-fired generation in the downstate area." *Id*.

In its role as central procurement administrator, NYSERDA issues solicitations seeking proposals to deliver offshore wind energy to New York. The competitively selected projects enter into contracts to sell renewable energy certificates, which represent the environmental attributes of offshore wind-generated renewable energy delivered into New York, to NYSERDA. NYSERDA then sells the certificates to utilities and other load serving entities (entities that provide electricity to customers) that are required to procure those certificates to comply with the Offshore Wind Standard.

In 2019, the New York Legislature passed the Climate Leadership and Community Protection Act (the Climate Act) to combat climate change by instituting statewide clean energy targets, 2019 N.Y. Laws ch. 106 §§ 1, 2 (codified at N.Y. Env't Conserv. Law §§ 75-0101 *et seq.*), including the procurement of at least 9 gigawatts

---

[2] Order Establishing Offshore Wind Standard and Framework for Phase 1 Procurement at 3, In re Offshore Wind Energy, No. 18-E-0071 (N.Y. Pub. Serv. Comm'n July 12, 2018) Docket Item No. 49, https://perma.cc/RVH9-J8XV.

of electricity generated by offshore wind resources by 2035, N.Y. Env't Conserv. Law § 75-0103(13)(e).

**B.    Factual Background**

**1.    The Sunrise Wind Project**

In November 2018, NYSERDA launched its first offshore wind solicitation. Declaration of Gregory Lampman (Lampman Decl.) ¶ 17. In May 2019, NYSERDA selected the Sunrise Wind Project, contingent on negotiation of a final agreement. *Id*. In October 2019, NYSERDA entered into an agreement with Sunrise Wind, pursuant to which NYSERDA agreed to purchase renewable energy certificates from Sunrise Wind. *Id*. ¶ 18. In 2024, following a solicitation process, that contract was replaced with a new contract with similar terms. *See id*. ¶¶ 19–22. The contract's purchase and sale obligations last for a term of 25 years, starting after the Sunrise Wind Project begins delivering energy to New York. *Id*. ¶ 22.

The Sunrise Wind Project is a wind farm that is being developed by Sunrise Wind and will be located in federal waters on the Outer Continental Shelf, approximately 30 miles east of Montauk, New York. Mot. for Prelim. Inj. (*Sunrise* PI Mot.), Ex. A, Decl. of Ryan Chaytors (*Sunrise* Chaytors Decl.) ¶¶ 1,7, Sunrise Wind LLC v. Burgum, C.A. No. 1:26-cv-00028 (D.D.C. Jan. 9, 2026) ("*Sunrise*"), ECF No. 11-1. The Project is expected to have a nameplate capacity (maximum power output) of 924 megawatts with 84 turbines, enough to power over 600,000 New York homes. *Id*. ¶¶ 7, 51. Construction activities for the Sunrise Wind Project began in July 2023. *Id*. ¶ 15. The first power from the Project is expected to be delivered in 2026, and the Project is expected to be fully operational in 2027. *Id*. ¶¶ 23, 51.

6

Currently, the Project is in an advanced stage of construction, with nearly 45% of the overall work done. *Id*. ¶ 9. Onshore aspects of the Project are over 90% complete. *Id*. ¶ 15. Offshore, Sunrise Wind has installed 44 out of 84 monopile foundations that will support the Project's wind turbine generators. *Id*. ¶ 19. Prior to the Suspension Order, generator installation was scheduled to begin in late February of this year. *Id*. ¶ 20.

As Sunrise Wind has explained, the Sunrise Wind Project has undergone extensive review for potential national security issues, including consultation with DOW. *See Sunrise*, Ex. B, Decl. of Edward LeBlanc (*Sunrise* LeBlanc Decl.) ¶¶ 25–30, ECF No. 11-2. The Record of Decision for the Project issued by BOEM and other agencies found that approving the Construction and Operations Plan, as modified by the terms and conditions included in the Record of Decision, "would be in accordance with the regulations at 30 C.F.R. Part 585 and would ensure that all the activities on the [Outer Continental Shelf] are carried out in a manner that provides for the factors in Subsection 8(p)(4) of OCSLA,"[3] which include "protection of national security interests of the United States." The Record of Decision also requires Sunrise Wind to mitigate any potential impacts on national security by entering into an agreement with DOW to take certain actions. *Id*., App. B at 19.

BOEM approved the Construction and Operations Plan in June 2024, allowing offshore construction of the Project to proceed. *Sunrise* Chaytors Decl. ¶12. That same

---

[3] BOEM et al., Record of Decision: Sunrise Wind Project Construction and Operations Plan, App. B. at 30 (Mar. 25, 2024), https://perma.cc/ML5W-ACCK.

day, BOEM sent Sunrise Wind its conditions of approval, which, like the Record of Decision, contain extensive mitigation requirements. *Sunrise* LeBlanc Decl. ¶ 30.

In January 2025, Sunrise Wind entered into an agreement with DOW and the Department of the Air Force, as required by the Record of Decision. *Id*. ¶31. Since that time, other than during the government shutdown, Sunrise Wind has participated in regular biweekly meetings with BOEM and Interior's Bureau of Safety and Environmental Enforcement (BSEE) to discuss construction updates, plans, reports, mitigation agreements and other issues related to the Project. *Sunrise* Chaytors Decl. ¶26. During the meetings, neither BOEM nor BSEE has raised any national security concerns. *Id*.

Pursuant to OCSLA, Sunrise Wind's Lease provides that, in the event of a suspension for national security or defense reasons under 43 U.S.C. § 1341, "[e]very effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations" and that "[a]dvance notice will normally be given before requiring a suspension[.]" *Sunrise* Compl., Ex. B., BOEM, Renewable Energy Lease No. OCS-A 0487, Commercial Lease of Submerged Lands for Renewable Energy Development on the Outer Continental Shelf Assigned to Lessee Sunrise Wind, LLC (Oct. 1, 2013) at Addendum C, Sec. 3.2.22 § 3(c), ECF 1-2. Such "[s]uspensions . . . for national security reasons" will "not generally exceed seventy-two (72) hours[.]" *Id*. at Addendum C, Sec. 3.2.3.

### 2.    The Wind Memo and Offshore Wind Suspension Orders

On January 20, 2025, President Trump issued a memorandum that halted all federal approvals for the development of offshore and onshore wind energy (the Wind

Memo). Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, Presidential Mem. of Jan. 20, 2025, 90 Fed. Reg. 8,363 (Jan. 29, 2025). Pursuant to the Wind Memo, several federal agencies ordered an immediate pause in the issuance of all wind energy authorizations (the Wind Order).[4] On December 8, 2025, the United States District Court for the District of Massachusetts ruled that the Wind Order "constitutes a final agency action that is arbitrary and capricious and contrary to law," and vacated it. *New York v. Trump*, No. 25-cv-11221, 2025 WL 3514301, at *1 (D. Mass. Dec. 8, 2025).

On August 22, 2025, BOEM ordered Revolution Wind, which is under construction off the coast of Connecticut and Rhode Island, to halt all ongoing activities so BOEM could "address concerns that have arisen during the review that the Department is undertaking pursuant to the President's Memorandum of January 20, 2025."[5] Revolution Wind sued and this Court preliminarily enjoined the order. Order Granting Mot. for Prelim. Inj., Revolution Wind, LLC v. Burgum, No. 1:25-cv-02999 (D.D.C. Sept. 22, 2025), ECF No. 36. The Court found the order "represent[ed] a clear change in position on the part of [BOEM], which previously certified that the project did not implicate national security or interference concerns as part of its

---

[4] *See, e.g.*, Temporary Suspension of Delegated Authority, Sec'y of the Interior Order No. 3415 (Jan. 20, 2025), https://www.doi.gov/document-library/secretary-order/3415-temporary-suspension-delegated-authority.

[5] BOEM, Director's Order to Revolution Wind, LLC (Aug. 22, 2025), https://perma.cc/DY5P-AYJT.

multiyear, multiagency approval process for the project" and "there are strong reliance interests at stake." Tr. Prelim. Inj. Hr'g at 41:1–5, 43:6–7, *id.* ECF No. 39.

On December 22, 2025, only two weeks after the Wind Order was vacated and with no advance notice, Acting Director Giacona directed five offshore wind projects, including Sunrise Wind, to "suspend all ongoing activities related to the Sunrise Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security." Sunrise Compl., Ex. A, BOEM, Director's Order to Sunrise Wind LLC, *Sunrise* ECF No. 1-1. The Suspension Orders state that BOEM could "further extend the 90-day suspension" pending its discussions with DOW. *Id.* at 1.

These Suspension Orders are purportedly based on "national security threats" raised in a November 2025 classified assessment conducted by DOW. *Id.* Even though BOEM claims to base the Suspension Order on the Sunrise Wind Project's "potential to cause serious, immediate, and irreparable harm" to national security, Acting Director Giacona did not issue the Order until December 22, 2025, nearly a month after he first reviewed the classified information purportedly supporting that determination.

Like the other Suspension Orders, the Suspension Order for the Sunrise Wind Project did not identify any component of the Project that raised new national security concerns; explain why the Project's existing mitigation measures would not sufficiently address such concerns; explain BOEM's change in position; consider Sunrise Wind's or New York's reliance on BOEM's past approval of and support for the Project; or consider alternatives to suspending the Project for 90 days.

The Suspension Order "invites" Sunrise Wind to "meet and confer" about potential mitigation measures but offers no explanation for why it was necessary to take the drastic step of broadly suspending activities with no notice given existing mitigation measures in place that could have alleviated the need for suspension, *see, e.g.*, *Sunrise* PI Mot. at 13, or why 90 days or more may be required for resolution.

In a press release issued the same day, DOI discussed "unclassified reports from the U.S. Government," including a 2024 report that predated the execution of Sunrise Wind's January 2025 agreement with DOW and the Department of the Air Force.[6] DOI also attempted to justify the Suspension Orders by citing alleged "national security risks inherent to large-scale offshore wind projects," namely, "the movement of massive turbine blades and the highly reflective towers [that] create radar interference called 'clutter,'" which purportedly "obscures legitimate moving targets and generates false targets in the vicinity of the wind projects." *Id*. As DOI acknowledges in the press release, the potential for "clutter" is not new information, and in fact, the issue was described in an unclassified Department of Energy report from 2024.

Despite OCSLA's directive to the Interior Secretary to facilitate the "expeditious and orderly development" of wind energy on the Outer Continental Shelf, 43 U.S.C. § 1332(3), the Interior Secretary and the President have made

---

[6] Press Release, U.S. Dep't of the Interior, The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases.

countless statements in public interviews and announcements maligning offshore wind energy that are unrelated to national security. For example, on December 22 and 23, 2025, in interviews with Fox News concerning the Suspension Orders, the Interior Secretary contended that offshore wind projects are unreliable, unaffordable, and bad for marine life. *Sunrise* LeBlanc Decl. ¶¶ 21, 23. He also posted on the social media platform X that offshore wind is a scam and a "GIANT rip off for every American consumer." *Id*. ¶ 24. And at a press conference on January 9, 2026, President Trump announced, "my goal is not to build any windmills in this country."[7] He offered several reasons for his opposition to wind energy but did not mention national security.

Several governors, including New York Governor Hochul, have requested a classified briefing to review the unexplained national security threats on which the Suspension Orders are based,[8] however, to date no briefing or other information has been provided.

### 3.   New York's Injuries

The Sunrise Wind Project provides myriad substantial benefits to New York on which New York relies. By imperiling the viability of the Project, the Suspension Order jeopardizes these benefits. The Suspension Order poses an immediate threat

---

[7]   Aaron Rupar (@atrupar), X, (Jan. 9, 2026, 4:10 PM), https://x.com/atrupar/status/2009734529045364757?s=46.

[8] *See* Press Release, Mass. Governor Maura Healey & Lieutenant Governor Kim Driscoll, Exec. Off. of Energy Env't Affs., Governors to Secretary Burgum: Lift the Offshore Wind Stop Work Orders (Dec. 24, 2025), https://www.mass.gov/news/governors-to-secretary-burgum-lift-the-offshore-wind-stop-work-orders.

to New York's energy interests; economic interests; and environmental and public health interests.

*The Suspension Order Threatens the Viability of Sunrise Wind*. The wind energy industry operates in a tremendously complex logistical and regulatory environment, where even minor setbacks can dramatically increase costs and lead to projects being severely delayed and even abandoned. This is true for the Sunrise Wind Project. Sunrise Wind has carefully sequenced its construction schedule and has contracted specialized vessels necessary for construction. *Sunrise* Chaytors Decl. ¶ 31. These vessels are in limited supply globally and are tightly scheduled, with back-to-back contractual commitments. *Id*. If Sunrise Wind does not resume construction by February 6, 2026, there is a very high risk it will not complete installation of the mid- and far-shore portion of its offshore export cable before the latest vessel availability date for the specialized vessel required to complete that critical work. *Id*. ¶ 37. If that happens, the Project's first power and commercial operations dates, which are important milestones in revenue generation for the Project's financial viability, will be delayed. *Id*. Such delay would in turn delay revenue generation, compromise the Project's financial viability, and may therefore make it economically infeasible for the Project to continue. Thus, the Suspension Order represents an existential threat to the Project, and the longer the Order remains in place, the less likely it is that the Project will be constructed.

*The Suspension Order Threatens New York's Energy Interests*. The Suspension Order threatens immediate harm to New York's energy interests by decreasing

electric generating capacity, resource diversity, and reliability. First, without the Suspension Order, the Sunrise Wind Project is expected to begin delivering power to New York's electricity grid this year and be fully operational next year. *Sunrise Chaytors Decl.* ¶¶ 23, 51. If the Suspension Order remains in place and the Project is cancelled, New York will lose the addition of 924 megawatts to its grid at a time when more capacity is needed. According to analysis performed for New York's recently released 2025 State Energy Plan, future electricity demand is projected to grow due to large new loads and electrification of transportation and buildings. Lampman Decl. ¶ 34. Consistent with those findings, the New York Independent System Operator (NYISO), in its October 2025 Q3 Short-Term Assessment of Reliability Report, identified a need for additional electric generation on Long Island as early as the summer of 2026. *Id.* ¶ 35. The 2025 State Energy Plan finds that offshore wind is expected to make up a material component of new generation needed to meet New York's growing need for abundant, reliable, affordable and clean energy. *Id.* ¶ 34. Thus, the Sunrise Wind Project is an essential component of New York's energy adequacy.

Second, the addition of offshore wind generation from the Sunrise Wind Project to New York's energy mix provides critical resource diversity benefits to New York's energy system. A report authored on behalf of NYISO has noted that "[g]enerating resource diversity of all types—in fuel source, mode of operation, geography, size, etc.—can contribute to the resilience and reliability of the power system." *Id.* ¶ 33. For example, the Sunrise Wind Project would reduce New York's dependency on oil

and natural gas in cold weather. *Id.* ¶ 37. If the Suspension Order remains in place and the Project is cancelled, these benefits will be lost.

Third, the electricity from the Sunrise Wind Project will enhance the reliability of the grid on Long Island. The 2025 State Energy Plan identifies a number of stressors to New York's electricity system that require substantial deployment of new energy resources alongside modernization of essential transmission and distribution infrastructure. *Id.* ¶ 34. NYISO reports that by 2030, 6.2 gigawatts of fossil fuel generation in New York will reach an age beyond which 95% of similarly aged generators nationally are expected to retire. *Id.* Aging generators pose reliability risks if they are extended, so investing in new energy sources is essential for long-term reliability. *Id.* Moreover, NYISO identified a short-term reliability need in Long Island beginning in summer 2027 due to the deactivation of certain generators. *Id.* ¶ 36. Near-term alternatives to offshore wind energy in constrained areas like Long Island are limited. *Id.* ¶ 38. The Sunrise Wind Project will contribute materially to ensuring grid reliability in Long Island when it comes online. *Id.* ¶ 35. But if the Suspension Order is left in place causing the Project to be cancelled, New York would likely need additional investments to maintain reliability. *See id.* ¶ 37.

*The Suspension Order Threatens New York's Economic Interests.* The Suspension Order harms New York's economic interests by depriving New York of the benefits of its contract with Sunrise Wind, imposing major costs on New York, and chilling investment in and development of offshore wind in New York. First, the Sunrise Wind Project is projected to pay hundreds of millions of dollars in taxes to

15

New York state and local governments over the life of the Project. *Id*. ¶ 25. NYSERDA's agreement with Sunrise Wind specifically calls for over $875 million in total economic benefits to accrue to New York by the end of the third year of the project's operations, with more to accrue afterwards. *Id*. ¶¶ 26–27. The economic benefits expected to accrue to New York include investments in electrical infrastructure, establishment of operational and logistics facilities, the purchase of goods, services and materials from New York businesses, workforce development initiatives, and expenditures towards fish and wildlife monitoring. *Id*. ¶¶ 29–32. The Sunrise Wind Project also supports numerous jobs in New York that generate income taxes for New York. *Id*. ¶ 28. The Project is supporting more than 3,500 direct and indirect jobs in construction, steel manufacturing, shipbuilding, and operations. *Sunrise* Chaytors Decl. ¶ 56. Many of these are high-paying union jobs. *See id*. If the Sunrise Wind Project does not proceed, these benefits will not accrue to New York. As it stands, hundreds of Project workers are idled due to the Suspension Order.

Second, the Sunrise Wind Project's cancellation also would impose major costs on New York. NYSERDA and other state agencies would need to invest substantial time and money to analyze the impact of the Project's cancellation and to determine whether the clean energy from the Project could be replaced. Lampman Decl. ¶ 47. Any such replacement, if one existed, would not be available on the same timeline as the Project. *Id*. Also, it would likely be more expensive because the pricing of NYSERDA's contract with Sunrise Wind was fixed years ago and inflation has put upward pressure on the cost of offshore wind projects. *Id*. In addition, it is unlikely

16

that the replacement's developer would have access to the same federal tax credits that apply to the Project. *Id*. The loss of these tax credits would increase costs to New York's electricity ratepayers. *Id*.

Third, cancellation of the Project would reflect a highly uncertain federal regulatory environment and chill the investment in and development of offshore wind in New York, making any timely replacement of the Project even more unlikely. *Id*. ¶ 49. The Project began construction in July 2023 and is the result of over a decade and a half of work by New York's public and private sectors to develop the industry. The Suspension Order reduces the ability of New York's public and private sectors to rely upon rational, non-arbitrary federal permitting processes when investing money, time, and other resources in offshore wind projects. *Id*. As a result of the Suspension Order, offshore wind developers will be far more cautious about investing in project development, and financing costs will rise, driving longer development timelines and resulting in adverse financial impacts on ratepayers. *Id*.

*The Suspension Order Threatens New York's Climate Objectives and Environmental and Public Health Interests.* The Suspension Order threatens New York's sovereign interests by impeding its ability to implement state law. The Climate Act sets greenhouse gas-reduction objectives of 40% by 2030 and 85% from 1990 levels by 2050. N.Y. Env't Conservation Law § 75-0107. It calls for New York to have a 100% greenhouse gas emissions-free electricity sector by 2040 and be powered by 70% renewable energy. N.Y. Pub. Serv. Law § 66-p(2). Offshore wind projects are expected to play a significant role as New York pursues a zero-emissions electric

17

system pursuant to the Climate Act, which targets the development of 9 gigawatts of offshore wind energy by 2035. *Id*. § 66-p(5). The suspension of the Sunrise Wind Project's construction will impede New York's ability to fulfill its statutory objectives under the Climate Act, thereby injuring New York's ability to implement its own laws. Declaration of Sanjay Seth (Seth Decl.) ¶ 21. It also risks forcing New York to incur additional expenses to meet the Climate Act's emissions and renewable energy targets. *Id*.

The Suspension Order will also have significant adverse environmental consequences to New York if left in place. *Id*. ¶ 22. Cancellation of the Project will delay the reduction of greenhouse gas emission reductions in New York. These emissions contribute to climate change, which is causing a variety of adverse impacts to New York. For example, sea level rise from climate change is leading the loss of state lands through coastal erosion and to coastal flooding, which is shifting the tide lines used to delineate boundaries between public and private properties—with significant implications due to the loss of property for property owners, local property tax revenues, and New York as owner of lands under water. *Id*. ¶ 12. Also, extreme heat events in New York are leading to significant losses in worker productivity and reduced economic output and productivity. *Id*. ¶ 13. And climate change is increasing the costs to water supply systems in New York. *See id*. ¶ 14.

Finally, if left in place, the Suspension Order will injure public health in New York. Notably, the generation mix in downstate New York is currently only 10% zero-emissions. *Id*. ¶ 17. It is anticipated that incorporating offshore wind in the locations

where fossil-fuel combustion turbines are now used to meet energy demand—for example, in the New York City metropolitan ozone nonattainment area—will reduce air pollutant emissions and improve air quality for New Yorkers. *Id.* ¶ 18. By reducing the need for electric generation from combustion turbines, the Sunrise Wind Project is anticipated to reduce emissions of fine particulate matter, nitrogen oxides, volatile organic compounds, and other toxic and hazardous air pollutants. *Id.* ¶ 19. The halt in the Sunrise Wind Project's construction will delay reductions in greenhouse gas emissions and air quality improvements by stalling the transition from over-reliance on fossil fuel-based energy to energy derived from diverse sources, including offshore wind. *Id.* ¶ 22–24.

### C.    Challenges to the Suspension Orders Regarding the Other Offshore Wind Projects

In addition to Sunrise Wind, the December 22, 2025, Suspension Orders issued to other offshore wind projects have also been challenged, by both developers and impacted states. On January 12, 2026, this Court granted a preliminary injunction to Revolution Wind, LLC, Rhode Island, and Connecticut, enjoining the Revolution Wind Suspension Order. Order Granting Mot. Prelim. Inj. & Order Granting State Pls.' Mot. Prelim Inj., Revolution Wind, No. 1:25-cv-02999 (Jan. 12, 2026) ECF Nos. 63–64. Three days later, this Court also granted a preliminary injunction to Empire Wind Leaseholder, LLC, enjoining the Empire Wind Suspension Order. *See* Minute Order Granting Mot. Prelim. Inj., Empire Leaseholder LLC v. Burgum, No. 1:26-cv-00004 (D.D.C. Jan. 15, 2026). Dominion Energy Virginia, the developer of the Coastal Virginia Offshore Wind Project, has challenged the suspension issued to it in a

complaint filed in the Eastern District of Virginia. Va. Elec. & Power Co. v. U.S. Dep't of Interior, No. 2:25-cv-00830 (E.D. Va. Dec. 23, 2025), ECF No. 1. On January 16, 2026, the court granted a preliminary injunction to Dominion Energy Virginia, enjoining the Dominion Stop Work Order. On January 15, 2026, Vineyard Wind 1 LLC filed a complaint and a concurrent motion for temporary restraining order and preliminary injunction challenging the suspension of the Vineyard Wind project that is located approximately 14 miles offshore of Massachusetts on the Outer Continental Shelf. Compl. & Mot. for TRO & Prelim. Inj., Vineyard Wind 1 LLC v. U.S. Dep't of Interior, No. 1:26-cv-10156 (D. Mass. Jan. 15, 2026) ECF Nos. 1, 3. A hearing on Vineyard Wind's motion is calendared for January 23, 2026. *Id.* ECF No. 14.

**ARGUMENT**

The State has standing to challenge the Suspension Order and has established that the Court should issue a preliminary injunction and a stay pending review because the State is likely to succeed on the merits and will suffer irreparable harm in the absence of preliminary relief, and a preliminary injunction is in the public interest.

## I. THE STATE HAS STANDING TO CHALLENGE THE SUSPENSION ORDER.

To establish standing, "a litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–64 (1992). A "material risk of future harm can satisfy the concrete-harm requirement in the

context of a claim for injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 415 (2021).

As shown by Sunrise Wind, the Project is existentially threatened due to the Suspension Order. *Sunrise* PI Mot. at 36-41. The Project provides myriad substantial benefits to the State that will be lost if the Suspension Order forces the Project's cancellation. The Suspension Order therefore poses an immediate threat of injury to New York's energy interests; economic interests; environmental and public health interests; and its sovereign interests.

First, if the Suspension Order forces Sunrise Wind to cancel the Project, the State in turn loses a significant component of its energy plan, threatening grid reliability, the transition from over-reliance on fossil fuel-based energy to energy derived from diverse and renewable sources, including offshore wind, and higher costs for ratepayers. *See* pp. 13–15 above; *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 185 (D.C. Cir. 2022) (States suffered injury from increased electricity costs due to interest "in protecting their citizens and electric ratepayers in the traditional government field of utility regulation"). Second, because the State will lose a source of offshore wind energy, the Suspension Order threatens New York's ability to effectuate its own laws and policies by impeding its ability to meet the requirements of both the Offshore Wind Standard and the Climate Act's statewide clean energy targets, which include the procurement of at least 9 gigawatts of electricity generated by offshore wind by 2035. *See Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C.

21

Cir. 1989) ("[s]tates have an interest, as sovereigns, in exercising 'the power to create and enforce a legal code" (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982)); *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007) (recognizing a state's "stake in protecting its quasi-sovereign interests"); *Maine v. Norton*, 257 F. Supp. 2d 357, 374 (D. Me. 2003) (federal interference with state sovereign interests in managing its natural resources and "enacting and enforcing its own legal code" constitutes injury in fact). Third, the Suspension Order jeopardizes the investments made by the State in infrastructure and facilities for the Project, and countless hours of planning, while depriving the State of economic benefits and tax revenue expected from the Project. *See* pp. 15–17 above; *Wyoming v. Oklahoma*, 502 U.S. 437, 447 (1992) (holding that decreased tax revenues constitute injury in fact); *Franchise Tax B. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990) (same as to diminished return on investment); *New Jersey v. EPA*, 989 F.3d 1038, 1046 (D.C. Cir. 2021) (noting that "exacerbated administrative costs and burdens . . . constitute a concrete and particularized injury"); *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("a loss of even a small amount of money is ordinarily an 'injury'"). Fourth, the Suspension Order will delay reductions in greenhouse gas emissions, threatening the loss of state lands as a result of climate change-induced sea level rise and coastal erosion. *See* pp. 187–19 above; *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 77 (D.C. Cir. 2020) (finding standing where agency action "will lead to an increase in [greenhouse gas] emissions, which will in turn lead to an increase in climate change,

which will threaten petitioners' coastal property"); *see also California v. EPA*, 72 F.4th 308, 313 (D.C. Cir. 2023) (similar).

As to traceability and redressability, the Suspension Order is indisputably the cause of the looming existential threat to the Project and the cascading injuries that will befall the State if the Project is severely delayed or cancelled. *See N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp.3d 290, 305 (D.D.C. 2025) (citation omitted) ("a plaintiff must show that his injury in fact is 'fairly traceable' to the challenged action of the defendant[;] . . . [t]he injuries must flow from Defendants' actions and cannot be the 'result [of] the independent action of some third party not before the court.'") (quoting *Lujan*, 504 U.S. at 560–61). For the same reason, a favorable resolution that allows the Project to proceed according to its intricate and sequenced construction plan will prevent the harms to the State discussed here. *See New York v. Trump*, 2025 WL 3514301, at *5 (citing *Gutierrez v. Saenz*, 606 U.S. 305, 320 (2025)) (finding states had standing to challenge agencies' implementation of an order halting permitting process for wind energy projects).

Accordingly, the State has standing to press its claims before this Court.

## II. THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION AND A STAY PENDING REVIEW.

To obtain a preliminary injunction, the movant must establish that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that the injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The same factors govern issuance of a stay pending review under the

Administrative Procedure Act, 5 U.S.C. § 705. *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021); *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020).

A movant need not "demonstrate definitive harm." *Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 101 (D. Me. 2008). Rather, a showing that "irreparable injury is *likely*" will suffice. *Winter*, 555 U.S. at 22 (emphasis in original). The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The State has established all of these factors.

### A.    The State Is Likely to Succeed on the Merits.

The State is likely to succeed on the merits of its claim that the Suspension Order is arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). As Sunrise Wind has shown, the Suspension Order is arbitrary and capricious because it fails to provide a reasoned explanation; (2) violates the change-in-position doctrine; and (3) fails to demonstrate that a narrower alternative would not have addressed the Agency Defendants' concerns. *Sunrise* PI Mot. at 18–28. The State incorporates that argument by reference here.

24

The Suspension Order is also arbitrary and capricious because it fails to consider New York's reliance interests, as required when an agency changes its position. *See, e.g. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 31–32 (2020) (reliance interests of third parties including those of States are relevant when evaluating change in Government position); ); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222-23 (2016) (Government failed to consider industry's reliance on longstanding policy in structuring its operations); *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75, 94 (D.R.I. 2025) ("DHS did not meaningfully evaluate the states' reliance interests, even though the record shows that states have structured their budgets and emergency preparedness planning for decades around consistent federal support."); *Thakur v. Trump*, 787 F. Supp. 3d 955, 985 (N.D. Cal. 2025) (university researchers were likely to prevail on claim that mass research grant termination was arbitrary and capricious where Government failed to consider "waste that would result from projects halted before completion, or the loss to the public of critical research that will go unpublished"). New York has relied on the Project as a component of its strategies to support grid reliability, energy diversification, and climate objectives, *see* pp. 13–15 above, and there is no indication that Agency Defendants considered, much less accounted for, these reliance interests.

## B. The State Will Suffer Irreparable Harm Absent Preliminary Relief.

To obtain preliminary relief, the State must show that it is "likely to suffer irreparable harm in the absence of preliminary relief." *See Winter*, 555 U.S. at 20. Many types of injuries are irreparable, and district courts "have broad discretion to

evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Wagner v. Taylor*, 836 F.2d 566, 576 (D.C. Cir. 1987).

The first power from the Sunrise Wind Project is expected to be delivered in 2026, and the Project is expected to be fully operational in 2027. If the Project is cancelled, as Sunrise Wind anticipates will happen if the Suspension Order is not enjoined, New York will suffer imminent harm.

As Sunrise Wind explains, a carefully orchestrated schedule is necessary to meet this deadline. *Sunrise* PI Mot. at 36-39. Significantly, if the Suspension Order remains in place, Sunrise Wind risks losing access to vessels it needs to proceed with construction, which may result in the vessels not being available again until later this year or even 2027 and make it economically infeasible for the Project to continue. Sunrise Wind believes it crucial to obtain relief no later than February 6, 2026, to meet upcoming construction deadlines. *Id.* at 36-37. Without such rapid relief, Sunrise Wind may need to abandon the Project.

The Sunrise Wind Project provides significant energy, sovereign, economic, environmental and air quality benefits to New York, most of which will be lost if the Project is cancelled. *See* pp. 14–19 above. Harm to the State is, therefore, actual and imminent. *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

*Harm to New York's energy interests.* The Suspension Order poses irreparable harm to New York's energy interests because it undermines New York's efforts to diversify its energy supply and enhance grid resiliency and capacity in order to

support downstate electric load growth while also meeting its climate objectives. *See* pp. 13–15 above. Electricity demand is expected to grow in New York and meeting that demand requires expansion of the electricity system, including offshore wind, which is a proximate and directly accessible resource to New York's significant downstate load centers. *See* pp. 13–15 above. If the Suspension Order remains in place, the Project will be cancelled, resulting in a loss of the addition of 924 megawatts to New York's grid at a time when New York needs more capacity and resource diversity, as well as renewable energy.

The Suspension Order will also chill the growth and development of offshore wind in New York, causing further harm to New York's interests in grid resiliency, capacity, and diversity and in renewable energy. *See* pp. 13–15 above. By stopping construction of an offshore wind project after over a decade of planning, the Suspension Order will lead offshore wind developers to be far more cautious about investing in project development. *See* pp. 17–18 above.

*Harm to New York's sovereign interests.* For the same reasons, the Suspension Order also irreparably harms the State's sovereign interests by impeding its ability to meet the requirements of both the Offshore Wind Standard and the Climate Act's statewide clean energy objectives, which includes the procurement of at least 9 gigawatts of electricity generated by offshore wind by 2035. *See* pp. 4–6, 13–15 above; *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (a state's "inability to enforce its duly enacted plans clearly inflicts irreparable harm."); *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (where federal "decision places [a state's] sovereign

interests and public policies at stake, we deem the harm the State stands to suffer as irreparable"); *Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 17 (D.D.C. 2014) (threats to state sovereignty can constitute irreparable harm).

*Harm to New York's economic interests.* If the Sunrise Project is cancelled, New York will lose substantial tax revenue and economic benefits. The Sunrise Wind Project is projected to pay hundreds of millions of dollars in taxes to New York state and local governments over the life of the Project and also supports numerous jobs in New York, which generate income taxes for New York. *See* pp. 15–17 above; *New York v. Trump*, 2025 WL 3514301, at \*4 (finding that federal government's indefinite suspension of permitting actions for wind projects would harm plaintiff States by reducing or deferring tax revenue and investments). The Project will provide other economic benefits to New York, including investments in electrical infrastructure, sourcing of goods, services, and materials from New York, and workforce development initiatives. *See* pp. 14–19 above; *Woonasquatucket River Watershed Council v. USDA*, 778 F. Supp. 3d 440, 474 (D.R.I. 2025) (irreparable harm demonstrated based on reduced hiring, layoffs, cancelled contracts with local businesses, shuttering of planned projects, and disruption or waste of thousands of hours of planning); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 297 (W.D. La. 2022) (substantial threat of irreparable "damages through loss of jobs in the oil and gas sector, higher gas prices, losses by local municipalities and governments, as well as damage to Plaintiff States' economy").

If the Project fails because of the Suspension Order, the State will also need to devote significant time, resources, and expense to address the loss of additional energy that is also renewable energy. The negotiation, contracting, permitting, and construction of a project of this scale takes years to complete, and NYSERDA and other state agencies would need to invest substantial time and money to analyze the impact of the Project's cancellation and to determine whether the clean energy from the Project could be replaced. *See* pp. 15–17 above; *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (citations and quotation marks omitted) (finding irreparable harm if the challenged action "perceptibly impair[s]" an organization's programs or "ma[kes] the organization's *activities* more difficult" and the action "directly conflict[s] with the organization's mission"); *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 175–76 (D.D.C. 2021) (finding irreparable harm when an organization needed to divert staff resources in response to a challenged action); *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 178 (D.D.C. 2017) (finding irreparable harm when a challenged action would "divert[] scarce resources away from previously planned projects" and require an organization to "spend significant resources on research, outreach, . . . and advocacy").

*Harm to the environment and public health.* New York will also experience significant adverse environmental and public health consequences if the Suspension Order is left in place. New York is already experiencing the consequences of warming trends and impacts of climate change on a significant scale. *See* pp. 17–19 above. The Project would offset greenhouse gas emissions and emissions of other harmful air

pollutants by lessening dependence on generation sources that emit those air pollutants and improving local air quality and public health. *See* pp. 15–19 above; *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable."); *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25 (D.D.C. 2009) (same). Offshore wind energy's potential contribution to reducing emissions is particularly important for Long Island, which has a high density of emissions sources and a large population. *See* pp. 14–15 above.

In short, New York is likely to suffer irreparable harm if the Suspension Order is not enjoined.

### C.    The Balance of the Equities and Public Interest Favor Preliminary Relief.

The balance of the equities and the public interest strongly favor preliminary relief. The two factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. In weighing these factors, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief[,] . . . pay[ing] particular regard for the public consequences" that would result from either granting or denying the requested relief. *Winter*, 555 U.S. at 24 (quotation marks and citations omitted). Here, the balance tips decisively in favor of granting the requested relief because denying an injunction would deprive the public of significant benefits and there is no harm to the public if

Agency Defendants are ordered to allow the construction they have already reviewed and approved to proceed.

As discussed above (pp. 25–30), the Project will provide significant energy, economic, environmental, and health benefits to New York by helping to ensure reliable, clean energy, raising tax revenue, incentivizing local investments and workplace initiatives, and decreasing air pollution. As a result, if preliminary relief is denied, it would deprive the public of significant energy and economic benefits and harm public health and the environment. *See Nat. Res. Def. Council v. Kempthorne*, 525 F. Supp. 2d 115, 127 (D.D.C. 2007) (project that would "generate millions of dollars in revenue" is in the public interest).

Conversely, and weighed against the significant public interest in enjoining the Suspension Order, neither Agency Defendants nor the public face imminent harm if construction continues according to schedule while allowing any necessary mitigation measures to be explored concurrently. Indeed, "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 326–27 (D. Mass. 2025) (citations and quotation marks omitted). Conversely, there is "a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters*, 838 F.3d at 12 (citation omitted); *see also Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015). Moreover, there is no reason to believe that the substantial past national security reviews of the Sunrise Wind Project failed to consider the public interest.

In sum, there is a strong public interest in enjoining the Suspension Order and allowing previously approved operations and activities to resume.

## CONCLUSION

For the foregoing reasons, the State respectfully requests that the Court grant its motion for a preliminary injunction under Federal Rule of Civil Procedure 65 and Local Rule 65.1 and a stay pending review under 5 U.S.C. § 705.

Date: January 16, 2026
    New York, New York

Respectfully submitted,

LETITIA JAMES
Attorney General of New York

By:    /s/ *Joya Sonnenfeldt*
Monica Wagner
    *Deputy Bureau Chief*
Rene F. Hertzog
Laura Mirman-Heslin
Joya Sonnenfeldt
    *Assistant Attorneys General*
Libby Dimenstein
    *Special Assistant Attorney General*
Environmental Protection Bureau
28 Liberty Street
New York, New York 10005
(212) 416-8184
Joya.Sonnenfeldt@ag.ny.gov

Morgan Costello
    *Deputy Bureau Chief*
Environmental Protection Bureau
The Capitol
Albany, NY 12224