# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUNRISE WIND LLC,

       *Plaintiff,*

    v.

DOUGLAS J. BURGUM, in his official capacity as
Secretary of the U.S. Department of the Interior,
*et al.,*

       *Defendants.*

C.A. No. 26-cv-00028-RCL

---

STATE OF NEW YORK *et al.,*

       *Plaintiffs,*

    v.

DOUGLAS J. BURGUM, in his official capacity as
Secretary of the United States Department of the
Interior, *et al.*

       *Defendants.*

C.A. No. 26-cv-00072-RCL

## REPLY IN SUPPORT OF THE STATE'S MOTION FOR
## PRELIMINARY INJUNCTION AND STAY PENDING REVIEW

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................iii

INTRODUCTION ......................................................................................................... 1

ARGUMENT .................................................................................................................. 2

   I.   THE STATE IS LIKELY TO SUCCEED ON THE MERITS. ........................... 3

   II.  THE STATE WILL SUFFER IRREPARABLE HARM ABSENT
       PRELIMINARY RELIEF .................................................................................. 5

   III. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR
       PRELIMINARY RELIEF .................................................................................. 14

CONCLUSION ............................................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Air Transp. Ass'n of Am. v. Exp.-Imp. Bank of the U.S.*,
    840 F. Supp. 2d 327 (D.D.C. 2012) ........................................................ 11

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) .............................................................. 12

*Chef Time 1520 LLC v. Small Bus. Admin.*,
    646 F. Supp. 3d 101 (D.D.C. 2022) ........................................................ 11

*Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*,
    743 F. Supp. 3d 325 (D.N.H. 2024) ........................................................ 11

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ............................................................................ 6

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) .......................................................................... 4–5

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................................ 4

*Kansas v. United States*,
    249 F.3d 1213 (10th Cir. 2001) ............................................................ 14

*Luokung Tech. Corp. v. Dep't of Def.*,
    538 F. Supp. 3d 174 (D.D.C. 2021) .................................................. 14–15

*Nat'l Parks Conservation Ass'n v. Semonite*,
    282 F. Supp. 3d 284 (D.D.C. 2017) ........................................................ 13

*New York v. Trump*,
    No. 25-cv-11221, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) ................... 11–12

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
    461 U.S. 190 (1983) ............................................................................ 8

*Sierra Club v. U.S. Army Corps of Engineers*,
    990 F. Supp. 2d 9 (D.D.C. 2013) .......................................................... 13

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
   485 F. Supp. 3d 1 (D.D.C. 2020) .......................................................................... 11

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) .................................................................................................. 2

**Federal Statutes**

5 U.S.C. § 706(2)(A) ................................................................................................ 3

**Miscellaneous Authorities**

Aaron Rupar (@atrupar), X (Jan. 9, 2026, 4:10 p.m.),
   https://x.com/atrupar/status/2009734529045364757?s=46.................................. 17

Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, 12:59 p.m.),
   https://x.com/SecretaryBurgum/status/2003163435320926688 .......................... 17

**INTRODUCTION**

The State of New York and New York State Energy Research and Development Authority (together, the State) submit this reply memorandum in further support of their motion for preliminary relief from the December 22, 2025 order issued by the Bureau of Ocean Energy Management's (BOEM) Acting Director Matthew Giacona (together with the other defendants, Agency Defendants) "suspend[ing] all ongoing activities related to the Sunrise Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security" (the Suspension Order).[1] The State demonstrated in its moving papers that, in addition to the flaws identified by Sunrise Wind LLC (Sunrise Wind), the Order did not consider New York's significant reliance interests and will cause irreparable harm to New York and the public interest by undermining New York's efforts to ensure a reliable supply of electricity, interfering with New York's statutory objectives and resilience strategy, depriving New York of tax revenue and other economic benefits, and threatening public health by delaying New York's transition to energy sources that cause less air pollution. Agency Defendants fail to demonstrate that the Suspension Order was the product of reasoned decision-making, that the State will not be irreparably harmed, or that the balance of the equities weighs against preliminary relief. Accordingly, preliminary relief is warranted.

---

[1] Compl. Declaratory & Inj. Relief, Ex. A, BOEM Director's Order Issued Dec. 22, 2025, Directing Suspension of All Ongoing Activities Related to the Sunrise Wind Project (Suspension Order), *Sunrise Wind, LLC v. Burgum* (*Sunrise*), C.A. No. 26-cv-00028 (D.D.C.), ECF No. 1-1.

Indeed, courts, including this one, have now granted preliminary relief enjoining nearly identical directives to four other offshore wind projects. Notably, this Court granted preliminary relief not only to Revolution Wind, but also to Rhode Island and Connecticut, who, like New York, both stand to benefit from project completion and to suffer irreparable harms if a wind project is not completed.

## ARGUMENT

The State demonstrated in its moving papers that it satisfies the requirements for a preliminary injunction under *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). Pl.'s Mot. Prelim. Inj. (State Mem.) 23–32, *New York v. Burgum* (*New York*), C.A. No. 26-cv-00072 (D.D.C.), ECF No. 9. Agency Defendants fail to show that the State has not met those requirements and, as a result, preliminary relief remains warranted. First, the Suspension Order is arbitrary and capricious for the reasons explained by Sunrise Wind and because Agency Defendants changed their prior position without considering New York's reliance on that position. Second, the State will suffer irreparable harm absent preliminary relief. The fact that this harm is based on the significant risk that the Suspension Order will cause Sunrise Wind to cancel the Project does not render the State's harm any less clear, present, or irreparable. Third, the national security risk on which the Suspension Order is purportedly based does not outweigh the irreparable harm that the State will suffer if the Suspension Order remains in place or the anticipated energy, economic, and environmental public benefits that will result from the Project.

## I.     THE STATE IS LIKELY TO SUCCEED ON THE MERITS.

In its moving papers, the State demonstrated that it is likely to succeed on the merits of its claim that the Suspension Order is arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), for the reasons stated by Sunrise Wind in support of its motion for a preliminary injunction, Mot. Prelim. Inj. (*Sunrise* Mem.) 18–28, *Sunrise*, ECF No. 11; Reply Mot. Prelim. Inj. (*Sunrise* Reply Mem.) 3–11, *Sunrise*, ECF No. 33, including because the issuance of the Suspension Order violates the change-in-position doctrine, State Mem. 24–25. Instead of demonstrating that they have complied with the change-in-position doctrine, Agency Defendants suggest that (1) they have not changed their position, and (2) any duty to explain a change is curtailed when the change is based on new classified information, regardless of reliance interests. *See* Defs.' Opp'n Pls.' Mot. Prelim. Inj. (Opp'n Mem.) 18, *New York*, ECF No. 17. They are wrong on both theories.

First, Agency Defendants *have* changed their position and failed to acknowledge the change. By approving the Sunrise Wind Construction and Operations Plan (COP), Agency Defendants authorized construction that is now well underway and that the Suspension Order halted. Agency Defendants also previously determined that various national security and other issues could be sufficiently addressed through mitigation measures, a position the Suspension Order contradicts. Agency Defendants now contend that because they did not "invalidate or modify the lease or COP," they have not changed position. *Id.* However, the Suspension Order is a change in position that triggers "the requirement that [the] agency . . . display

3

awareness that it *is* changing position . . . . And of course the agency must show that there are good reasons for the new policy." *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Agency Defendants' refusal to acknowledge that they made a change alone violates this doctrine. S*ee also Sunrise* Reply Mem. 5–6 (explaining that BOEM has changed position even if it did not invalidate or modify the lease or COP).

Second, Agency Defendants are not excused from considering serious reliance interests here and fail to cite any law to support that assertion. Agency Defendants seem to contend that if there was a change, it was based on new, classified information, so they did not need to consider reliance interests. Opp'n Mem. 18–19. However, regardless of the cause of the change, Agency Defendants are still subject to the foundational requirement that, when agencies change course, they are "not writing on a blank slate, [and are] required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).

Nor does Agency Defendants' characterization of the State's reliance interests as non-regulated third-party interests, Opp'n Mem. 19, excuse Agency Defendants from having to identify and weigh such interests. For example, when it ruled that the federal government's rescission of the Deferred Action for Childhood Arrivals program was arbitrary and capricious, the Supreme Court held that the federal government violated the change-in-position doctrine through its failure to consider

not only the reliance interests of program recipients, but also of third parties including States and local governments. *Dep't of Homeland Sec.*, 591 U.S. at 31–32. By failing to address whether they considered New York's reliance on the Sunrise Wind Project to support grid reliability, energy diversification, and climate objectives, *see* State Mem. 13–15, Agency Defendants concede that they did not consider such interests. Agency Defendants' admitted failure to consider any reliance interests, including those of New York, violates the change-in-position doctrine and renders the Suspension Order arbitrary and capricious.

## II. THE STATE WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY RELIEF.

The State has demonstrated that it faces a significant risk of irreparable harm, State Mem. 25–30, and Agency Defendants' arguments to the contrary are without merit. As an initial matter, the State has alleged particularized irreparable harm and is not relying, as Agency Defendants claim, on harm to Sunrise Wind. Nor have Agency Defendants refuted the harm to New York. Contrary to Agency Defendants' arguments, the State has provided robust factual support for the harms to New York's energy interests; New York's economic injuries are well-founded, significant, and cannot be remedied in the course of normal litigation; the State has provided factual support for the importance of the Project in protecting the environment and public health; and the State may invoke harm to New York's sovereign interests even though the Suspension Order was directed at Sunrise Wind, not New York.

Agency Defendants initially seek to discount the State's entitlement to relief by arguing that the State's claims of harm are based on Sunrise Wind's harm and

thus, that the State is merely a third party. *See* Opp'n Mem. 9. In doing so, Agency Defendants ignore the crux of the State's argument: that a foreseeable (and, as demonstrated by Sunrise Wind, highly likely) consequence of the Suspension Order is Project cancellation, and that event, in turn, is the catalyst for the cascading and cumulative irreparable harm that will befall the State if the Suspension Order is not lifted. The State's detailed harms, while tied to the fate of the Sunrise Wind Project, are distinct from Sunrise Wind's harms and entitle the State to seek relief. Agency Defendants also incorrectly state that preliminary injunctions granted in other challenges to the December 22, 2025 suspension orders were only granted to the developers. This Court separately granted a preliminary injunction to the States of Connecticut and Rhode Island in *Revolution Wind, LLC v. Burgum* (*Revolution Wind*). Prelim. Inj., *Revolution Wind*, C.A. No. 25-cv-02999 (D.D.C.), ECF No. 64; *cf. Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (standing inquiry satisfied when State's standing theory relied "on the predictable effect of Government action on the decisions of third parties").

The State has also shown that it faces irreparable harm entitling it to obtain the relief it seeks. Agency Defendants' arguments in opposition fail because they ignore the factual support provided by the State for the harm to its energy, economic, environmental, and sovereign interests and, by calling into question the "imminency" of the harms, ignore that the precipitating event from which the State's irreparable harms directly and predictably flow is indeed clear and present.

*First*, contrary to Agency Defendants' claim, Opp'n Mem. 10, the State has provided robust factual support for its energy interests and the harms the Suspension Order pose to those interests. State Mem., Decl. of Gregory Lampman (Lampman Decl.), *New York*, ECF No. 9-1. The State has explained that expansion of the electricity system is necessary to meet large new load demands and that the Sunrise Wind Project will materially contribute to the resilience and reliability of the power system. *Id.* ¶¶ 33–37. Specifically, the State has shown that:[2]

- Electricity demand in New York will increase by 8% in 2030 and accelerate to 24% by 2040 and 42% by 2050;

- By 2030, 6.2 gigawatts of electricity produced by fossil fuel generators in New York will reach the age of retirement, posing reliability risks;

- Solutions for electrical system reliability are needed for New York City and Long Island as early as summer 2026;

- The Sunrise Wind Project will contribute materially to grid reliability in Long Island with improvements seen once Sunrise Wind is delivering power as planned;

- Offshore wind electricity supplied to New York City and Long Island would enhance grid reliability in cold weather;

- Other near-term alternatives are limited and major backlogs on equipment impede the ability to build other electricity generation projects in the near or medium term.

Thus, New York's energy interests and needs are significant, tangible, and well-documented. By delaying or removing introduction of the 924 megawatts of electricity this Project will provide, the Suspension Order imperils those interests. Indeed, courts have repeatedly acknowledged the States' "traditional responsibility

---

[2] *See id.* ¶¶ 33-39 for further details and citations to supporting reports and analyses.

in the field of regulating electrical utilities," including "determining questions of need, reliability, cost, and other related state concerns." *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983). Agency Defendants' arguments seeking to downplay those vital state interests are without merit.

Agency Defendants also suggest that the loss of the Sunrise Wind Project is of no moment to the State's energy interests because it is only one project. Not so. The Project will provide critical energy diversity benefits to the constrained zone on Long Island to which the Project will provide electricity. Lampman Decl. ¶ 37. Agency Defendants also ignore the vast complexity and long-term planning required to supply abundant and reliable energy to New York. As one of the first large-scale facilities to be built in New York, the Project would provide crucial lessons and experience to the offshore wind industry that can be used to improve and reduce the cost of offshore wind energy generation in New York. *Id.* ¶ 32. Agency Defendants similarly ignore the reality of the years-long process of developing a single offshore wind project. The Sunrise Wind Project has been more than a decade in the making, with the lease originally awarded by BOEM in 2013. *Id.* ¶ 13. It is the result of significant development, planning, approval, and financing steps prior to commencing construction and operation. *Id.* ¶ 11. Of course, Agency Defendants are well aware of the significant time and resources necessary to develop any offshore wind project because "New York has advanced its [offshore wind] work in close coordination with federal agencies[,]" *id.* ¶ 9, and those federal agencies play an

8

integral part in the process, which requires numerous detailed submissions and reviews under at least 16 federal statutes, *id.* ¶ 11. Moreover, Sunrise Wind is a large project that will generate 924 megawatts of electricity, or more than 10% of the Climate Act's procurement target of 9 gigawatts of electricity generated by offshore wind resources by 2035. *Id.* ¶¶ 4, 12. Even if the State began the process of finding a replacement project today, given the lengthy and complex process involved, it would be many years before such a replacement would be at the same stage of development as Sunrise Wind.

Additionally, that timeline presumes that a replacement project would proceed through an efficient and reliable permitting and approval process. Given the current Administration's targeting of wind projects, as evidenced by the numerous anti-wind statements made by the President and his Administration and the multiple orders, directives, and memorandums impeding the development, permitting, and approval of wind projects on federal lands, there is no way to predict when and whether a replacement project would advance to construction and operation. *See* State Mem. 9, 11–12; *id.* at 12 (President Trump announcing "my goal is not to build any windmills in this country"). The State's loss of a project that is so near completion and loss of the myriad attendant benefits from this specific Project stands to be a permanent and irreplaceable loss to New York.

*Second,* Agency Defendants argue that the State's economic harms are unfounded because the Suspension Order did not cancel the Project, but rather suspended it. Opp'n Mem. 11–12. As explained by Sunrise Wind, the Project's

viability is directly threatened by the Suspension Order because missed deadlines and resulting delays may render its completion economically infeasible. *Sunrise* Mem., Ex. A., Decl. of Ryan Chaytors ¶¶ 32–39, *Sunrise*, ECF No. 11-1. Indeed, Sunrise Wind conservatively estimates that it may incur "over $600 million in additional costs due to the Order" if it remains in effect through mid-summer 2026. *See* Mot. Leave File Suppl. Decls., Ex. A., Rebuttal Decl. of Ryan Chaytors ¶¶ 9–10, *Sunrise*, ECF No. 34-1. The Suspension Order also allows for the suspension to be continued beyond 90 days, subjecting the Project to risk of *de facto* cancellation if the suspension continues indefinitely. That cancellation or indeterminate suspension is the precipitating event leading to the State's economic harms. That the benefits flowing from the Project to the State will not immediately accrue does not make the urgency and need for the injunction any less. If that imminent and precipitating event is not avoided, those significant benefits to the State are jeopardized.

Agency Defendants also mischaracterize the State's explanation of the economic benefits that it stands to lose. The State will accrue "$875 million in total economic benefits . . . *by the end* of the third year of the Project's operations," Lampman Decl. ¶ 26 (emphasis added), not beginning *after* the third year, as Agency Defendants state, Opp'n Mem. 12. Additional significant economic benefits beyond that amount are expected to accrue as a result of the Project after the third year of operations. Lampman Decl. ¶ 27. The State has described in detail additional significant benefits that only may be realized if the Project proceeds as planned, including investments in electrical infrastructure, sourcing of goods, services and

materials from New York, workforce development initiatives, and fish and wildlife monitoring. *Id.* ¶¶ 29–32 (detailing millions of dollars of investments).

Agency Defendants cite *Air Transp. Ass'n of Am. v. Exp.-Imp. Bank of the U.S.,* 840 F. Supp. 2d 327, 335 (D.D.C. 2012), for the proposition that economic loss alone does not constitute irreparable harm. Opp'n Mem. 12. But that case explains that "this is because economic injuries are generally in fact reparable with monetary damages in the ordinary course of litigation." *Air Transp. Ass'n*, 840 F. Supp. 2d at 335; *see also Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*, 743 F. Supp. 3d 325, 362–63 (D.N.H. 2024) (financial loss is irreparable where movant will be unable to recoup monetary damages in the future from a federal agency). Here, monetary damages are not available to repair the State's loss of substantial investments and tax revenue claimed, particularly in this Administrative Procedure Act case, *see Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 115–16 (D.D.C. 2022) (unavailability of money damages for APA claims counsels in favor of finding irreparable harm); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 59 (D.D.C. 2020) (explaining that "injuries are unrecoverable because the present suit arises under the APA, which does not allow for money damages"), nor do Agency Defendants show otherwise. Agency Defendants also do not attempt to address *New York v. Trump,* in which the Court addressed a comparable scenario and determined that plaintiff States had standing because the federal government's indefinite suspension of permitting actions for wind projects

would harm them by reducing or deferring tax revenue and investments. No. 25-cv-11221, 2025 WL 3514301, at *4 (D. Mass. Dec. 8, 2025).[3]

*Third*, the State has explained that the Sunrise Wind Project will offset emissions of air pollutants that harm local air quality and public health in New York by lessening dependence on sources that emit those pollutants. Lampman Decl. ¶¶ 40–41. Agency Defendants respond that, because the Sunrise Wind Project will not address those harms in the near term, loss of the Project will not cause irreparable harm to New York's environmental interests. *See* Opp'n Mem. 13. But the reduction of air pollution is a years-long process, and the Suspension Order harms New York by impeding its ability to make that steady and necessary progress.

Agency Defendants cite several cases for the proposition that the State is not entitled to preliminary relief because irreparable harm will not beset it before the merits of the case are decided. Not so. Agency Defendants ignore that, as Sunrise has articulated, it will suffer irreparable harm from the halt of construction and "delay that will likely lead to cancellation of the Project absent injunctive relief." *Sunrise* Reply Mem. 2. If and when that occurs, many harms to the State will naturally follow. Moreover, under Agency Defendants' theory, the cascading, cumulative, and irreparable harm resulting from the Suspension Order can never be reviewable or fully redressed. The State is not required to wait until its sovereign energy interests

---

[3] Agency Defendants also cite *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297–87 (D.C. Cir. 2006), Opp'n Mem. 12–13, but there is no discussion of alleged economic harms in that decision. Instead, it explains that "the possibility that adequate compensatory or other corrective relief will be available at a later date, . . . weighs heavily against a claim of irreparable harm."

12

and need to provide reliable, abundant electricity to its residents are at a tipping point before obtaining relief.

In any event, Agency Defendants' cases are distinguishable. In *Sierra Club v. U.S. Army Corps of Engineers*, 990 F. Supp. 2d 9, 39 (D.D.C. 2013), the Court determined that plaintiffs failed to demonstrate irreparable harm because they provided only "bald allegations" that the environment would be irreparably harmed and did not show that potential environmental effects would be so "permanent or irreversible" as to warrant an injunction. In contrast, the State's harms from Project cancellation or severe delay will be permanent and irreversible, as the State cannot realize benefits from a project that will never be completed. In *National Parks Conservation Association v. Semonite*, *see* Opp'n Mem. 13, the plaintiffs challenged the construction of towers across a river to support an electrical infrastructure project and based their irreparable harm claims on recreational and aesthetic interests. 282 F. Supp. 3d 284 (D.D.C. 2017) (Lamberth, J.). In denying the plaintiffs' motion for preliminary injunction, the Court was "not persuaded that those alleged injuries are irreparable at this stage of the litigation" as construction would not begin for at least six months leaving the parties time to brief the merits. *Id.* at 288–89. In contrast, Sunrise Wind has shown that the Suspension Order is likely to lead to cancellation of the Project unless the Order is enjoined now and the State has shown that cancellation will cause it irreparable harm.

*Fourth*, Agency Defendants argue that the State may not invoke irreparable harm to its sovereign interests because "that New York may be impacted by the

actions of [a] private party does not transform this case into one about New York's sovereignty or authority to enforce its laws." Opp'n Mem. 11 (citation omitted). But the State has demonstrated that it will suffer irreparable harm as a result of the impact of the Suspension Order—an action undertaken by Agency Defendants—on Sunrise Wind. In any event, Agency Defendants mistakenly attempt to distinguish *Kansas v. United States*, 249 F.3d 1213, 1227–28 (10th Cir. 2001), on the ground that it was not "a state challenge to the federal government's regulation of a separate private party," Opp'n Mem. 11. While that challenge did not involve the federal government's regulation of a separate private party, it did involve the regulation of a separate party, the Miami Tribe. The court nonetheless held that that the federal government's action—a decision by the National Indian Gaming Commission that made it possible for the Tribe to operate a gaming facility on land that it leased but did not own—irreparably harmed the State of Kansas' sovereign interest in regulating that land. Here as well, the Agency Defendants' decision to stop Sunrise Wind from proceeding with the Project irreparably harms the State's interest in regulating energy production in New York.

## III.  THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR PRELIMINARY RELIEF.

Agency Defendants argue that the equities tip in their favor because the public interest in national security outweighs both the irreparable harm that the State will suffer if the Suspension Order remains in place and the anticipated energy, economic, and environmental public benefits that will result from Sunrise Wind Project. While "[t]his nation's security priorities are undoubtedly public interests[,]" *Luokung Tech.*

14

*Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021). Agency Defendants' public interest argument is "diminished" by the fact that the threats to national security allegedly caused by the Sunrise Wind Project do not appear to be "serious" or "immediate," if they exist at all. *See id.* at 195 (quotation marks & citation omitted) (expressing skepticism where it was unclear, as here, whether "weighty national security interests are actually implicated," *id.* at 195).

To begin, national security cannot outweigh the public benefits identified by the State because Agency Defendants argued in their opposition to Sunrise Wind's preliminary injunction motion that the Project will pose a national security risk only "if it becomes operational." Defs.' Opp'n Pls.' Mot. Prelim. Inj. (*Sunrise* Opp'n Mem.) 5, *Sunrise,* ECF No. 31; *see also Sunrise* Opp'n Mem., Attach. 1, Decl. of BOEM Acting Dir. Matthew Giacona (Giacona Decl.) ¶ 4, *Sunrise,* ECF No. 31-1 (alleging national security impacts "that arise from the operation of offshore wind projects"); *id.* ¶ 10 (asserting that that the Suspension Order was issued "[o]nce BOEM appreciated the national security risk that the Project will pose once it becomes operational"); *id.* ¶ 12 ("BOEM is not aware of measures that would mitigate the national security risks of the Project once it becomes operational"). But the Sunrise Wind Project is still a year from completion, *see* Lampman Decl. ¶ 23, and Agency Defendants do not explain what urgent national security interest would be served by halting all construction on the Project *before* it becomes operational. Agency Defendants do not adequately address, for example, why the alleged national security interests underlying the Suspension Order implicate Sunrise Wind's installation of an underwater export

15

cable, *see Sunrise* Mem. 27, and yet they have not allowed Sunrise Wind to proceed with the cable's installation in the meantime. The Suspension Order's overbreadth calls Agency Defendants' national security rationale into question.

Moreover, national security cannot outweigh the benefits identified by the State because Agency Defendants have not refuted Sunrise Wind's argument that national security is not the actual basis for the Suspension Order and is instead a pretext for what is essentially a politically motivated decision. *Sunrise* Mem. 19. Agency Defendants offer no evidence to rebut that argument, essentially conceding the point for purposes of Sunrise Wind and the State's motions for a preliminary injunction. *See Sunrise* Opp'n Mem. 19 (declining to address Sunrise Wind's pretext argument because "allegations of pretext would be best addressed through a challenge to any alleged inadequacies in the administrative record"). As Sunrise Wind explained in its opening brief, the circumstances surrounding the Suspension Order suggest that it was not based on urgent national security concerns. For one thing, although BOEM Acting Director Giacona received and reviewed the classified information as early as November 26, 2025, he did not issue the Suspension Order until December 22, 2025, nearly one month later. Giacona Decl. ¶ 6. For another, although the Suspension Order asserts that BOEM is "endeavor[ing] to reach a determination on feasible mitigation measures," Agency Defendants have refused to provide Sunrise Wind with access to the classified material, despite the developer's identification of representatives with the proper security clearances, nor have Agency Defendants provided Sunrise Wind with any unclassified information that could

facilitate the development of adequate mitigation measures. *See Sunrise* Mem., Ex. C, Decl. of Bryan Stockton ¶¶ 8–22, *Sunrise,* ECF No. 11-3.

Statements made by Agency Defendants and President Trump also cast doubt on whether the Suspension Order was based on a pressing national security threat. On December 22, 2025, the same day that the Suspension Order was issued, Interior Secretary Burgum posted a statement on the social media platform X describing offshore wind as "the MOST EXPENSIVE form of electricity."[4] A few weeks later, President Trump stated at a press conference that "my goal is not to build any windmills in this country."[5] These comments, which comprise only a small portion of the Trump Administration's public criticism of offshore wind energy, signal that national security is not the driving force behind the Suspension Order.

Moreover, in the course of defending the Suspension Order with respect to other offshore wind projects, Agency Defendants have provided four different judges with access to the same classified material in question and each judge has determined that the public interest in national security does not outweigh either the irreparable harm faced by the developers and the challenging States or the public interest in affordable and reliable energy, emissions reductions, and lawful agency action, *see* Tr. 44:7–10, *Revolution Wind,* ECF No. 65 (stating that Agency Defendants' failure to adequately explain themselves "suggests that the stated national security reason

---

[4] Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, 12:59 p.m.), https://x.com/SecretaryBurgum/status/2003163435320926688.
[5] Aaron Rupar (@atrupar), X (Jan. 9, 2026, 4:10 p.m.), https://x.com/atrupar/status/2009734529045364757?s=46.

may have been pretextual"); *id.* at 44:21–45:1 ("Given that [BOEM] became aware of the new classified information in November of 2025 and did not act until December 22, 2025, I'm not persuaded that any such emergency exists in this case, nor have I been provided any evidence of a new finding of particularized harm such that the government could order an immediate suspension."); Notice of Suppl. Auth., Ex. B 15:14-22, *Sunrise,* ECF No. 26-2 (oral ruling in *Empire Leaseholder LLC v. Burgum,* C.A. No. 26-cv-00004 (D.D.C.)) ("Giving deference to the government's determination of national security concerns and taking the classified information on its own terms, the record before the Court does not currently establish that the balance of the harms resulting from a preliminary injunction . . . outweighs the irreparable harm that Empire Wind will likely suffer in the interim."); *id.* Ex. D 51:20-23 (transcript of proceedings in *Va. Elec. & Power Co. v. U.S. Dep't of the Interior*, C.A. No. 25-cv-00830 (E.D. Va.)) ("[T]he evidence the Court has reviewed does not demonstrate that the onset of the national security risk is so imminent that the government needs to stop work on the Dominion project entirely."); *Sunrise* Reply Mem., Ex. B. 51:23–52:4, 55:17-22, *Sunrise*, ECF No. 33-2 (transcript of proceedings in *Vineyard Wind I LLC v. U.S. Dep't of the Interior*, C.A. No. 26-cv-10156 (D. Mass.)) (describing the government's stated national security concerns as "speculative" and finding that the government's delay in issuing the suspension orders "undermin[es] any claim that the [DOW reports] presented an emergency in need of immediate addressing").

On the other side of the ledger, the State will be irreparably harmed absent preliminary relief, and the public interest strongly weighs in favor of Sunrise Wind

completing the Project, which will enhance energy reliability, support a range of jobs, and reduce greenhouse gas emissions and toxic air pollutants. *See* pp. 5–14 *supra*. In this manifestly lopsided balancing exercise, injunctive relief is warranted.

## CONCLUSION

For the reasons above and in the State's opening brief, the Court should grant the State's motion to stay the Suspension Order and to preliminarily enjoin Agency Defendants from enforcing it.

Date: January 30, 2026                       Respectfully submitted,
      New York, New York

                                             LETITIA JAMES
                                             Attorney General of New York

                            By:     /s/ *Libby Dimenstein*
                                             Monica Wagner
                                              *Deputy Bureau Chief*
                                           Rene F. Hertzog
                                           Laura Mirman-Heslin
                                           Joya Sonnenfeldt
                                              *Assistant Attorneys General*
                                           Libby Dimenstein
                                              *Special Assistant Attorney General*
                                         28 Liberty Street
                                         New York, New York 10005
                                         (212) 416-8469
                                         libby.dimenstein@ag.ny.gov

                                         Morgan Costello
                                              *Deputy Bureau Chief*
                                         Environmental Protection Bureau
                                         The Capitol
                                         Albany, New York 12224